IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DELMARVA POWER & LIGHT
COMPANY,

     Plaintiff,

v.                      Civil Action No. 3:07cv392

COMMISSIONER THEODORE V.
MORRISON, JR., et al.,

     Defendants.

## MEMORANDUM OPINION

This matter is before the Court on Delmarva Power & Light Company's Motion For Temporary Restraining Order And Preliminary Injunction (Docket Nos. 2 and 3). For the reasons set forth below, the action will be dismissed without prejudice and the motion for injunctive relief will be denied.

## STATEMENT OF FACTS

In this case, Delmarva Power & Light Company ("Delmarva") complains that certain decisions by the Defendants Theodore V. Morrison, Commissioner, Mark C. Christie, and Judith Williams Jagdmann, Commissioners, in their official capacities as Commissioners of the Virginia State Corporation Commission ("SCC") made in the course of a rate setting will cause it to lose approximately $500,000 per month for the next year, an injury which

Delmarva asserts to be irreparable.[1]  The decisions that are alleged to be the cause of Delmarva's allegedly irreparable loss are grounded in the interpretation of a memorandum agreement, Virginia's contract laws, the Virginia Utility Restructuring Act ("Restructuring Act" or the "Act"), as originally enacted and as amended in 2004, a federal doctrine known as the "filed rate" doctrine, and the Takings Clause of the United States Constiution.

Delmarva buys wholesale electricity from third parties, and sells it to retail customers in Delaware, Maryland and Virginia's Eastern Shore.  The company has around 22,330 customers in Virginia.[2]  The Federal Energy Regulatory Commission ("FERC") regulates the price that Delmarva pays for the wholesale electricity it buys from third parties, see 16 U.S.C. § 824(b), while the SCC regulates the price that Delmarva charges when it sells that electricity to its Virginia retail customers.  See Va. Code Ann. §§ 56-232 et seq. (1999).

In 1999, the General Assembly of Virginia passed the Restructuring Act, which was designed in part to deregulate the generation, transmission, and supply of electricity in Virginia.

---

[1]     The Attorney-General of Virginia has intervened in the case and aligned his positions with those of the SCC.

[2]     Delmarva Pwr. & Light Co. Brief in Support of Motion for Temporary Restraining Order and Preliminary Injunction ("Pl.'s Mem."), Ex. 1, Tab 6, Part 1 at [unnumbered] 3.

To allow for a transition period between the existing regulated system and a future, deregulated system, the Restructuring Act provided that the SCC was to establish rate caps for electricity supply, "effective January 1, 2001, and expiring on July 1, 2007 . . . ." Va. Code § 56-582(A) (1999). The Act also provided that the SCC could set rates, apparently indefinitely, for those customers who received "default service." Va. Code § 56-585 (1999). Default service customers are those who either do not or cannot choose a reliable, economically competitive supplier of electricity. See Va. Code Ann. § 56-585(A).

The Act anticipated that, under deregulation, electrical utilities might want to divest assets or restructure themselves in order to specialize in the generation, transmission, or distribution of electricity. The Act, therefore, permitted such divestitures, but provided that the SCC would "direct" them. Va. Code § 56-590(B)(1) (1999). The concept of divestiture, along with the SCC's direction of the divestiture process, was fully integrated into the Act's structure, especially its rate cap system. The Act empowered the SCC to "adjust" capped rates over time, including rate adjustments based on the changing cost of fuel.[3] Va. Code § 56-582(B) (1999). Although the Act set forth a

---

[3]     Under the Restructuring Act, the cost of "fuel" included the prices that electrical retail suppliers paid to electrical

3

schedule to adjust rates to account for fuel, it also provided that any such adjustments would be made "in accordance with the terms of any [SCC] Order approving the divestiture of generation assets pursuant to § 56-590"--in other words, aside from whatever rate adjustments the Act might permit for changing fuel costs, those utilities that had been allowed to divest under the SCC's "direct[ion]" would have their rate adjustments for fuel costs governed by the SCC's order that had permitted their divestiture. Va. Code § 56-582(B)(i) (1999).

Before 2000, Delmarva was a vertically integrated electrical utility company which both generated electricity and sold it to retail customers. After the Restructuring Act was passed, however, Delmarva decided to divest its generating assets. Pursuant to the Act, Delmarva asked the SCC to approve its divestiture plan. The SCC evaluated the plan, and became concerned that the proposed divestiture would expose Delmarva's retail customers to the vagaries of the wholesale electricity markets, which could result in higher prices or less reliable service. (See Compl. Ex. B ("2000 Final Order") at 10.) To address the SCC's concerns, Delmarva proposed to enter into a Memorandum of Agreement ("MOA"). Delmarva and the SCC staff executed the MOA, and the SCC approved

---

generators for wholesale power. Such adjustments were governed by Va. Code § 56-249.6.

4

and memorialized it in an Order dated June 29, 2000, as part of its order permitting divestiture.  (Id.).

Much of the MOA dealt with how Delmarva would adjust its retail prices to account for the changing price of wholesale power. The MOA followed Va. Code §§ 56-582 and 56-585 by providing that Delmarva's "fuel factor"[4] would be calculated pursuant to a "Rate Case Protocol."   The Rate Case Protocol was to be based on (1) Delmarva's "generation mix" in as it stood in 1999, and (2) a "Fuel Index Procedure."   (Id. at 6).   The resulting electricity rate, according to the MOA, would be Delmarva's "capped rate" pursuant to Va. Code § 56-582, and would also be the "default rate" pursuant to Va. Code § 56-585.   (Id. at 6-7).   The MOA further provided that Delmarva could apply to the SCC to change its rates to adjust to changes in the cost of wholesale power by submitting an application pursuant to Va. Code § 56-249.6.[5]   (Id. at 6).   The eventual rate,

---

[4]   A "fuel factor" is a regulatory mechanism that allows utilities to adjust the cost they charge for electricity based on changes in the cost of fuel, or in the case of Delmarva, changes in the cost of wholesale electricity.

[5]   Va. Code § 56-249.6, for its part, created a procedure by which electric utilities might adjust rates in connection with fuel costs.   The section directed that once a year on a date set by the SCC, utilities were to submit to the SCC an estimate of how much it would cost them to purchase power in the coming twelve months.   Va. Code § 56-249.6 (1999).   Section 56-249.6 then provided that "[u]pon investigation of such estimates and hearings in accordance with the law," the SCC would allow the utilities to adjust their rates via a "tariff" for those costs that the SCC "determine[s] . . . to be appropriate . . . ."   Va. Code § 56-249.6 (1999).

however, was to be calculated within the framework of the MOA's Rate Case Protocol and its Fuel Index Procedure.  (Id.).

The MOA provided that the use of the Fuel Index Procedure to calculate capped rates would begin on January 1, 2004, but it did not provide an end date.  Additionally, the MOA stated the capped rate set by the SCC for Delmarva under Va. Code § 56-582 and the MOA was to "be deemed its default rate pursuant to Va. Code § 56-585 whenever Delmarva is a provider of default service during any period in which capped rates are in effect . . . ."  (Id. at 6-7.

It is clear from the record that the divestiture was approved only because the SCC considered the MOA to afford protection against non-competitive electricity prices and unreliable service. Thereafter, Delmarva divested its assets and began selling power at rates calculated under the Restructuring Act and the MOA.

That was not the end of the story, however.  In 2004, the General Assembly of Virginia amended the Restructuring Act.  Va. Code § 56-582, which originally had empowered the SCC to set rate caps "effective January 1, 2001, and expiring July 1, 2007," was changed to read simply that the SCC was empowered to set "capped rates, effective January 1, 2001 . . . ."  Va. Code § 56-582(A) (Supp. 2006).  In the place of a fixed expiration date, the 2004 amendment to Va. Code § 56-582 provided that utilities could petition the SCC to end the capped rates, and that the SCC could

6

eliminate capped rates for the utility upon a finding that "an effectively competitive market" existed in the service territory of the utility. Va. Code § 56-582(C) (Supp. 2006). Additionally, Va. Code § 56-249.6, which previously had not mentioned any specific dates for rate adjustments for fuel costs, was changed to provide that adjustments for fuel costs would operate through 2010. Va. Code § 56-249.6(C).[6]

On April 2, 2007, apparently pursuant to Va. Code § 56-582(B)(i) and Va. Code § 56-249.6, Delmarva filed an application to modify its power rates. (See Compl. Ex. C ("Order and Notice of Hearing") at 1.) Though it submitted fuel expense predictions that would allow the SCC to calculate its "fuel factor" pursuant to the Rate Case Protocol in the MOA, Delmarva also argued that it was not bound by the MOA, for several reasons.

First, Delmarva argued that the MOA expired on June 30, 2007, and therefore did not control the rates thereafter. The allegations of the Complaint and the briefing on the motion for preliminary injunction disclose that Delmarva grounded that argument on the interplay among the text of the original Restructuring Act, the text of the MOA, and the text of the 2004 and 2007 amendments to the Restructuring Act. (See e.g. Compl. Ex.

_____

[6]     The Restructuring Act was also amended in 2007.

7

D.).[7]  Delmarva also argued that requiring it to charge a rate capped under the Fuel Index Protocol in the MOA would violate the federal "filed rate" doctrine, and also would effect an unconstitutional taking of property without just compensation.

The SCC Order directed Delmarva and the SCC's staff to submit legal memoranda addressed to the above described issues, and ordered that a public hearing be held regarding Delmarva's rate on July 9, 2007.  Delmarva and the SCC staff submitted legal memoranda, testimony and exhibits.  On June 8, the SCC issued an Order in which it held that the MOA was still in effect, and that keeping rates at the MOA's levels neither violated the federal filed rate doctrine nor effected an unconstitutional taking.  (See Compl. Ex. D.)  Delmarva then moved the SCC to reconsider its ruling.  On June 25, the SCC denied Delmarva's motion.  (See Compl. Ex. E.)

On June 29, Delmarva filed both the Complaint initiating this action (Docket No. 1), and the Motion For Temporary Restraining Order And Preliminary Injunction (Docket Nos. 2 and 3), along with a supporting memorandum and exhibits (Docket No. 4).  The Complaint has two counts.  Count I alleges that the June 8 and June 25 Orders of the SCC violated the federal filed rate doctrine.  Count II

---

[7]     The briefs filed with the SCC are not part of the record in this case.

alleges that those Orders effected an unconstitutional taking of Delmarva's property without just compensation.

On July 9, the SCC held the scheduled rate hearing to set Delmarva's going-forward rate under the Rate Case Protocol and the Fuel Index Procedure. The SCC set new rates in a July 11, 2007 Order.

Delmarva's motion for preliminary injunction asks the Court to enter an Order requiring the SCC to allow "Delmarva to put into effect immediately a fuel factor of 6.5986¢ per kwh, subject to refund, pending resolution of Delmarva's claims in this action."[8] This relief is said to be necessary because the SCC Orders of June 8 and June 25, if not enjoined, will cause Delmarva irreparable injury; to wit: the loss of approximately $500,000 per month which, according to Delmarva, it cannot be assured of recouping under Virginia law even if its positions on the filed rate doctrine or the unconstitutional taking of property are sustained on the merits.[9]

---

[8]     Delmarva  Power  &  Light  Company's  Motion  For  Temporary Restraining Order And Preliminary Injunction,  (Docket Nos. 2 and 3) at 1.

[9]     The briefing on the injunction issues disclosed that, in fact, Virginia  law  does  permit  the  SCC  to  make  retroactive  rate adjustments and Delmarva's position evolved to become that there was no certainty that the SCC would allow a retroactive adjustment.

9

Because the Court was apprehensive whether there was subject matter jurisdiction over this action, and, if so, whether that jurisdiction should be exercised, the parties were asked to address those issues. A hearing on those threshold questions and on the motion for preliminary injunction was held on July 18, 2007.

## DISCUSSION

Usually, a decision should not be made on alternative grounds. Karsten v. Kaiser Found. Health Plan of the Middle Atl. States, Inc., 36 F.3d 8, 11 (4th Cir. 1994). However, because this case presents a somewhat novel question of subject matter jurisdiction, it is one of those few cases in which it is appropriate to depart from that general proscription. Accordingly, the issues of the subject matter jurisdiction and abstention will be addressed seriatim.

### I.

The issue of jurisdiction presented here is governed by the Rooker-Feldman doctrine. Rooker v. Fidelity Trust Co., 263 U.S. 143 (1923); District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983). The Rooker-Feldman doctrine outlines "the limited circumstances in which [the Supreme Court's] appellate jurisdiction over state-courts judgments . . . precludes a United States district court from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a

10

Congressional grant of authority."   Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291 (2005).   As the Court explained in Exxon Mobil Corp:

> The Rooker-Feldman doctrine . . . is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceeding commenced and inviting district court review and rejection of those judgments.

Exxon Mobil Corp., 544 U.S. at 284.   In other words, the question is whether a state-court loser has "repaired to federal court to undo the [state-court judgment]."   Exxon Mobil Corp., 544 U.S. at 293.

The SCC operates as a court of record and as a legislative entity.   As the parties agree, the Rooker-Feldman doctrine applies only to judicial acts, and not to legislative acts.   See Feldman, 460 U.S. at 482-83.   To distinguish between what constitutes a judicial act and what constitutes a legislative act, the Supreme Court, in Feldman, relied chiefly on two decisions.   Feldman, 460 U.S. at 479-82.

First, the Court relied upon Prentis v. Atlantic Coastline Co., 211 U.S. 210 (1908).   In Prentis, the Court reviewed the railroad rate setting activity of the SCC's predecessor, the Virginia Corporations Commission, which, like the SCC today, had

11

both judicial and legislative authority.  In determining that the
setting of a railroad rate was a legislative act, the Supreme Court
held that:

> a judicial inquiry investigates, declares, and
> enforces liabilities as they stand on present
> or past facts and under laws supposed already
> to exist. . . . legislation, on the other hand
> looks  to  the  future  and  changes  existing
> conditions by making a new rule, to be applied
> thereafter  to  all  or  some  part  of  those
> subject to its power.

Prentis, 211 U.S. at 266.  The Court continued to explain that "the
question [of whether the proceeding is legislative or judicial]
depends not upon the character of a body, but upon the character of
the proceedings."  Id.

Prentis thus clarified that the purpose of a proceeding,
rather than its form or appearance, determined whether it was
legislative or judicial.  However, in Prentis, the Court was not
called upon to assess the circumstance presented by Delmarva's
complaint.  Here, unlike in Prentis, Delmarva complains that it has
been caused injury by Orders and decisions of the SCC that bear all
the hall marks of adjudicative acts.  However, those orders were
issued during a rate-making process.

The second decision relied on in Feldman,  In re: Summers, 325
U.S. 561 (1945), is a useful guide for assessing what approach to
follow in such a circumstance.   In Summers, the Illinois state

12

bar's Committee on Character and Fitness refused to certify Summers, notwithstanding that he had passed the state's bar examination.  325 U.S. at 563.  Summers petitioned the Illinois Supreme Court to admit him, not withstanding the Committee's refusal to issue him a certificate, because the Committee's refusal violated his due process rights.  Id. at 564.  The Illinois Supreme Court "consider[ed]" Summers' petition, and then denied it.  Id. at 364, 567 n.8.  Summers then appealed the case to the Supreme Court of the United States.

The Supreme Court of the United States accepted the contention that the admission of attorneys to the Illinois bar was, in general, a ministerial, and not a judicial, function of the Supreme Court of Illinois.  Nonetheless, the Court explained that, in deciding the nature of a "proceeding," "we must ourselves appraise the circumstances of the refusal [i.e., the decision about which Summers complains]."  In re: Summers, 325 U.S. at 566.  The Court then focused on how the Supreme Court of Illinois had made the decision to deny Summers' petition and concluded that, because Summers had "claim[ed] a present right of admission to the bar," id. at 568, and because the Supreme Court of Illinois had given that claim "consideration" and then rejected it, id. at 567 n.8, the Supreme Court of Illinois engaged in a judicial act, notwithstanding that it was involved in the performance of an

13

otherwise ministerial function.[10]  The Court continued to emphasize that "[t]he form of the proceeding is not significant.  It is the nature and effect which is controlling."  Id. at 567 (internal citations omitted).    That, of course, harkens back to the explanation in Feldman that "[a] judicial inquiry investigates, and declares, and enforces liabilities as they stand on present or past facts and under laws supposed already to exist. . . ."  Prentis, 211 U.S. at 226.  Feldman, in turn, cited Summers to distinguish judicial proceedings from legislative proceedings for purposes of applying the Rooker-Feldman doctrine.  Feldman, 460 U.S. at 477-79.

In this case, the SCC was involved in the process setting electricity rates.  During the course of that process, the SCC also engaged in a proceeding that was a judicial proceeding, and it is the Orders that came from that judicial proceeding that Delmarva claims to have caused the injury of which it complains here.  The two Orders issued by the SCC were the product of an investigation and a declaration by the SCC concerning the liabilities of the parties as they stood on past facts and laws supposed already to exist.  Using the teaching of Prentis and Summers, it seems clear

---

[10]    Summers involved the question of whether an Article III case or controversy existed for the Supreme Court of the United States to review.  See In re Summers, 325 U.S at 568-69.  It was the Court in Feldman that used Summers to distinguish judicial acts from legislative or ministerial acts for the purposes of jurisdiction in federal district courts.  See Feldman, 460 U.S. at 477-79.

14

that the proceedings which led to the Orders here complained of
were a judicial inquiry for the purposes of determining whether the
Rooker-Feldman doctrine applies to circumscribe this Court's
jurisdiction.[11]

The question then becomes whether the circumstances before the
Court call for the application of the Rooker-Feldman doctrine under
the formulation specified by Exxon Mobil Corp. as applied and
interpreted in this circuit in Davani v. Virginia Department of
Transportation, 434 F.3d 712 (4th Cir. 2006) (citing Hoblock v.
Albany County Bd. of Elections, 422 F.3d 77, 85 (2nd Cir. 2005).

First, it is necessary to ascertain whether the federal-court
plaintiff lost in state court.   Here, Delmarva, the federal
plaintiff, presented to the SCC all of the issues presented in this
Complaint, and Delmarva lost.

Second, the federal plaintiff must complain of injuries caused
by a state-court judgment.  That is because, under the requirements
of Exxon Mobil Corp. and Davani, the state court judgment must be
the source of the injury that is claimed in federal court before
the Rooker-Feldman doctrine even comes into play.   Exxon Mobil

---

[11]     The parties do not dispute that the Rooker-Feldman doctrine,
if applicable, applies to a state-court order of an interlocutory
nature as well as to final state-court orders.  Brown & Root, Inc.
v. Breckenridge, 211 F.3d 194, 199 (4th Cir. 2000); 18 Moore's
Federal Practice § 133.30[3][c].

Corp., 544 U.S. at 284.   In <u>Davini</u>, our Court of Appeals looked to the federal complaint to ascertain whether the federal plaintiff was alleging, in federal court, that the state-court injury caused the injury sought to be redressed in federal court.   <u>Davani</u>, 434 F.3d at 719.   <u>See also</u> <u>McCormick v. Braverman</u>, 451 F.3d 382, 393 (6th Cir. 2006) (explaining that the inquiry is to identify "the source of the injury the plaintiff alleges in the federal complaint)."

In this case, the Complaint makes clear that the source of the injury of which Delmarva complains is the Orders of the SCC. (Compl. ¶¶ 42, 45, 47.)   During oral argument, counsel for Delmarva explicitly stated that it was the SCC Orders of June 8 and June 25 that caused the injury of which Delmarva complains in its federal Complaint.   Accordingly, this aspect of the <u>Exxon Mobil Corp.</u> formulation is satisfied.

Third, the Court must determine whether it is being asked to review and reject the state court judgment.   That, of course, is exactly what Delmarva seeks here.

Fourth, the state-court judgment must have been rendered before the district court proceedings were begun.   This case was

16

initiated by Delmarva after entry of the Orders of the SCC of which it complains here.[12]

The facts of this case satisfy all four components of the test established by Exxon Mobil Corp. and Davani.   Therefore, the Rooker-Feldman doctrine applies here.  Accordingly, the Court lacks subject matter jurisdiction in this action.

However, the Rooker-Feldman issue presents itself in a somewhat novel circumstance in this case because the decisions complained of as causing Delmarva's injury were the result of a judicial proceeding that was part of a legislative process.  It is possible to construe the decision in Prentis to mean that whether the act at issue is legislative or judicial should be examined by looking at the proceedings as an integrated whole.  For example, in Prentis, the Supreme Court commented that:

> It does not matter what inquiries may have been made as a preliminary to the legislative act.  Most legislation is preceded by hearings and investigations.  But the effect of the inquiry, and of the decision upon it, is determined by the nature of the act to which the inquiry and decision lead up.

---

[12]    After this case was filed, the SCC issued, on July 11, 2007, a subsequent Order setting Delmarva's rates.  That Order is not a part of this case.

* * *

> So, when the final act is legislative, the
> decision which induces it cannot be judicial
> in the practical sense, although the questions
> considered might be the same that would arise
> in the trial of a case.

Prentis, 211 U.S. at 227-28.

Were it not for the subsequent decision in Summers, that
passage would seem to instruct that a hearing that occurs within a
legislative rate-making is to be considered as a legislative
proceeding, notwithstanding that it has all the hallmarks of a
judicial inquiry.  As explained above, it appears that Summers
calls for a different result.  However, in recognition that Summers
might not call for the result outlined above, it is prudent and in
the interest of justice to analyze the alternative position of the
SCC that, even if there is subject matter jurisdiction here, the
Court should abstain from the exercise of that jurisdiction.

## II.

The SCC argues that the Court should abstain from the exercise
of jurisdiction under the principles established in Burford v. Sun
Oil Co., 319 U.S. 315 (1943).  The abstention doctrine announced in
Burford is distilled as follows:

> Where timely and adequate state court review
> is available, a federal court sitting in
> equity must decline to interfere with the
> proceedings or orders of state administrative
> agencies (1) when there are difficult

> questions of state law bearing on policy
> problems of substantial public import whose
> importance transcends the case at bar; or (2)
> where the exercise of federal review of the
> question in a case and in similar cases would
> be disruptive of state efforts to establish a
> coherent policy with respect to a matter of
> substantial public concern.

New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,

491 U.S. 350, 361 (1989) ("NOPSI") (internal citations and

quotations omitted). The "difficult questions of state law"

contemplated by this doctrine need not come in the form of state-

law claims. Indeed, the Burford doctrine applies when federal

claims are "entangled in a skein of state-law that must be

untangled before the federal case may proceed." McNeese v. Bd. of

Ed. for Cmty. Unit Sch. Dist. 187, Cahokia, 373 U.S. 668, 674

(1963).

Although the general rule set forth above gives district

courts guidance with respect to Burford abstention, "[t]he Supreme

Court's decisions 'do not provide a formulaic test for determining

when dismissal under Burford is appropriate.'" First Penn-Pacific

Life Ins. Co. v. Evans, 304 F.3d 345, 348 (4th Cir. 2002) (quoting

Quackenbush v. Allstate Ins. Co., 517 U.S. 706, 727 (1996)).

Instead, a district court's abstention analysis is governed by a

"general concern" for "principles of federalism and comity." Id.

As the Fourth Circuit emphasizes:

19

> what is at stake is a federal court's
> decision, based on a careful consideration of
> the federal interests in retaining
> jurisdiction over the dispute and the
> competing concern for the "independence of
> state action," Burford, 319 U.S. at 334, 63 S.
> Ct. 1098, that the State's interests are
> paramount and that a dispute would best be
> adjudicated in a state forum.

Id. (quoting Quackenbush, 517 U.S. at 728).

Abstention under Burford, or any other doctrine, "remains the exception and exercise of congressionally mandated jurisdiction remains the rule." Johnson v. Collins Entm't Co., Inc., 199 F.3d 710, 722-23 (4th Cir. 1999). For example, even though "Burford is concerned with protecting complex state administrative processes from undue federal interference, it does not require abstention whenever there exists such a process, or even in all cases where there is a potential for conflict with state regulatory law or policy." NOPSI, 491 U.S. at 362. Therefore, courts regularly exercise jurisdiction over suits involving the federal filed rate doctrine even though their decisions will impact an industry subject to extensive state regulatory control. See, e.g., NOPSI, 491 U.S. at 364 (denying Burford abstention in federal filed rate case); Pub. Serv. Co. of N.H. v. Patch, 167 F.3d 15, 24 (1st Cir. 1998) ("Patch IV") (same); Appalachian Power Co. v. Pub. Serv. Comm'n of W. Va., 614 F. Supp. 64, 71 (S.D. W. Va. 1985) (same). In those cases, however, the absence of difficult state law

questions counseled against abstention.   See NOPSI, 491 U.S. at 361-64; Patch IV, 167 F.3d at 24; Appalachian Power, 614 F. Supp. at 70.

Notwithstanding a federal court's "virtually unflagging obligation" to exercise jurisdiction, Colorado River Water Conservation Dist. v. United States, 424 U.S. 800, 817 (1976), Burford abstention remains appropriate where, as described above, a federal court is asked to resolve "difficult questions of state law bearing on policy problems of substantial public import" or where such state law questions are dressed up "in federal clothing," Johnson, 199 F.3d at 722.   For example, in Johnson, the Fourth Circuit held that abstention was required where a suit under the federal RICO statute necessitated the resolution of difficult state law issues relating to an industry (video poker gambling) which was subject to extensive state regulation.   199 F.3d at 715, 720-23.   The Fourth Circuit explained that "[i]ssues of state law and state public policy [had] dominated [that] action from day one," and that, because the action "involved a most basic problem of South Carolina public policy, the state court system should have been permitted the first opportunity to resolve it."   Id. at 720. Abstention was further justified because South Carolina courts possessed concurrent jurisdiction over the plaintiffs' federal claims, and because, in all other ways, the state courts could

provide adequate review of the relevant legal issues.   See id. at
723.

In Browning-Ferris, Inc. v. Baltimore County, Md., 774 F.2d 77
(4th Cir. 1985), the Fourth Circuit found Burford abstention proper
in an action filed under 42 U.S.C. § 1983.   In that case, the
plaintiff entered into an agreement with the State of Maryland and
Baltimore County under which the plaintiff was granted a permit to
operate a landfill.   Browning-Ferris, 774 F.2d at 78.   The State
maintained that the plaintiff violated that agreement, and refused
to renew the plaintiff's permit.   Id.   The plaintiff contended that
the case was one of simple contract interpretation, but the Fourth
Circuit determined that a federal court hearing the case "would
eventually be required to decide if [the plaintiff] was eligible
for a permit; and, if [the plaintiff] was eligible, the court would
have to order the state to issue the permit and allow the landfill
to operate."   Id. at 79.   Those questions touched on complicated
state and local concerns which were subject to "a comprehensive
regulatory scheme" that was "lengthy and detailed" and which
involved "complex scientific questions."   Id.   Because a federal
court would have "become involved in the complexities of state land
use control," the Fourth Circuit determined that Burford abstention
was appropriate.

Here, as in <u>Johnson</u> and <u>Browning-Ferris</u>, the issues presented by Delmarva necessarily require the resolution of difficult issues of state law and policy that are the subject of a comprehensive state regulatory scheme.   First, without question, any "<u>Burford</u> requirement that a complex state regulatory scheme be involved in order for a district court to abstain is sufficiently present in this case."[13]   <u>Browning-Ferris</u>, 774 F.2d at 79.   The Virginia legislature and the SCC have worked for years to determine whether and how to regulate the energy industry in this state.   Indeed, the parties' papers are replete with descriptions of the complicated legislative and regulatory efforts recently undertaken with respect to Virginia's energy industry.   (<u>See, e.g.</u>, Compl. at 5-8;   Pl.'s Mem. at 3-9.)   No party disputes that this action arises out of that complex and evolving regulatory regime.

Second, this case requires the resolution of complicated state law issues that may significantly impact Virginia's regulation of the energy industry.   In fact, the Court cannot address Delmarva's federal claims without, at some point, assessing the validity and applicability of the MOA under state law.   For example, Delmarva contends that the federal filed rate doctrine admits of no

---

[13]     The Court recognizes, of course, that <u>Burford</u> abstention may be appropriate outside the context of a state regulatory scheme. <u>See</u> <u>First Penn-Pacific</u>, 304 F.3d at 351 n.3.

exceptions, and that the Court may simply enforce the filed rate doctrine without so much as considering the MOA; but the Court may do no such thing. (See Delmarva's Resp. to Mot. to Dismiss or Stay and Reply in Supp. of Mot. for Prelim. Inj. at 15 (contending that "[t]he filed rate doctrine completely preempts" any state action).) The FERC filed rate does not, in all instances, displace a contractual agreement, see FPC v. Sierra Pacific Power, 350 U.S. 348 (1956), and the filed rate doctrine may not apply where a state has determined that a utility acted imprudently in procuring energy in a particular quantity from a particular source (rather than at a particular price), see Pub. Serv. Co. of N.H. v. Patch, 167 F.3d 29, 35-36 (1st Cir. 1998). To determine whether the MOA meets either of those exceptions, the Court would be forced to consider not just the four corners of the MOA, but also its contested validity and enforceability, its status under state law (i.e., whether it is a contract or some other type of agreement), and the nature of the state policies it advances (if any). Thus, the federal questions in this action are "entangled in a skein of state-law that must be untangled before the federal case may proceed," McNeese, 373 U.S. at 674, and the Supreme Court of Virginia should have the first opportunity to conduct the untangling, see Johnson, 199 F.3d at 720.

More importantly, the federal issues raised by Delmarva may be resolved if the validity of the MOA is determined as a threshold

issue.[14]  For example, the SCC concedes that the filed rate doctrine

would necessarily apply if the MOA has expired (see Reply Mem. in

Supp. of Mot. to Dismiss at 2), and Delmarva concedes that there

would be no taking if the MOA remains a valid and enforceable

agreement between the parties (see Pl.'s Mem. at 21-22).  Thus, the

legal force of the MOA remains the central issue in this action: it

must be decided at the outset of this action (lest the case be

analyzed in reverse order), and it is best considered by the

Supreme Court of Virginia.

     Without question, the state law issues involved in this case

are complicated and novel.  For example, Delmarva contends that the

MOA was terminated by the state legislature's recent decision to

halt the process of deregulation.   (See Pl.'s Mem. at 7-9, 18.)

The resolution of that contention will have a far reaching, and

perhaps unpredictable, impact on Virginia's regulatory regime.  It

will certainly impact similar MOAs between the SCC and other energy

companies.   (See Def.'s Mot. to Dismiss or Stay Action at 7 n.2

(noting that The Potomac Edison Power Company, which is party to a

memorandum of agreement like Delmarva's, was recently denied a rate

increase similar to the one requested by Delmarva).)   Virginia

---

[14]    In fact, Delmarva's primary objective in this action is to
overturn the SCC's decision to apply the MOA after July 1, 2007.
Delmarva filed this action shortly after losing that legal issue
before the SCC and did not wait until the SCC actually set a retail
rate that would violate the filed rate doctrine or effect a taking.

courts should have the first opportunity to interpret new and important Virginia statutes that, in the context of the state's overall regulatory scheme, may or may not have terminated SCC-approved agreements with energy utilities.

The parties also disagree about whether the MOA is subject to private contract law. (See Pl.'s Mem. Ex. D at 20.) Resolution of that question is likely to involve an evaluation of the SCC's status under state law and an assessment of the SCC's authority to require binding agreements from utility companies in the context of energy deregulation. Despite what Delmarva contends, those questions are not easily answered, and, again, the answers may have far-reaching and unpredictable implications beyond the case at bar. Because those questions are governed by Virginia law and are so important to Virginia's regulatory regime, the Supreme Court of Virginia should answer them.

Undoubtedly, adequate review may be had in the Virginia courts. Delmarva may appeal the SCC's orders to the Supreme Court of Virginia as of right, see Va. Const., art. IX, § 4, and the Supreme Court of Virginia will evaluate the SCC's legal conclusions respecting the MOA, the filed rate doctrine, and Delmarva's takings claim without deference. See First Virginia Bank v. Commonwealth, 213 Va. 349, 351 (1972). If the parties take their dispute to the Supreme Court of Virginia, the federal interests implicated in this case will be adequately protected, and the paramount state issues

26

in this case will properly be decided by a court with the expertise to resolve them.

Finally, this case is unlike other filed rate cases in which federal courts have declined to abstain under Burford. Delmarva cites four such cases, and none involved complicated state law issues like the ones involved here. In NOPSI, the Supreme Court noted specifically that the case did not directly or indirectly implicate issues of state law. See 491 U.S. at 361. Indeed, the Court said that, "[u]nlike a claim that a state agency . . . has failed to take into consideration or properly weigh state-law factors, federal adjudication of this sort of pre-emption claim would not disrupt the State's attempt to ensure uniformity in the treatment of an essentially local problem." Id. at 362 (internal citations and quotations omitted). Here, on the other hand, the action does involve a claim that a state agency failed to consider or properly weigh state law (i.e., that the SCC erroneously applied the MOA), and litigation over that important issue is inevitable given the parties' positions.

Similarly, in Public Service Co. of New Hampshire v. Patch, the First Circuit declined to abstain where the case presented only issues of federal law. 221 F.3d 198, 203 (1st Cir. 2000). While that case, like this one, potentially involved an exception to the federal filed rate doctrine, the analysis of New Hampshire's claim to that exception did not require the federal court to consider

27

complicated and novel state law issues.  See id.  Here, the Court would first have to assess whether the MOA is valid, enforceable, and presently applicable under state law before reaching the filed rate issues.  Indeed, the validity of the MOA has "dominated this action from day one," and because that paramount issue comes to the Court only cloaked "in federal law clothing," Burford abstention is proper on the particular facts of this case.  Johnson, 199 F.3d at 720-21 (internal citations and quotations omitted).

The decisions in Monongahela Power Co. v. Schriber, 322 F. Supp. 2d 902 (S.D. Ohio 2004) and Appalachian Power Co. v. Public Serv. Commission of West Virginia, 614 F. Supp. 64 (S.D. W. Va. 1985) do not compel a different result.  In each case, like the cases described above, the courts made a particular point of explaining that no important state law issues were implicated.  See Monongahela, 322 F. Supp. 2d at 916; Appalachian Power, 614 F. Supp. at 71.

In sum, the requirements of Burford are met in this case, and the Court is obliged to abstain.  First, adequate state review of this administrative decision is undoubtedly available.  Second, as described at length above, the case involves "difficult questions of state law bearing on policy problems of substantial public import."  Third, the answers to those questions have an "importance which transcends the case at bar" because they implicate Virginia's efforts to protect consumers from the unpredictable consequences of

deregulation efforts undertaken, and since halted, by the Virginia legislature. And finally, because the SCC has entered into similar MOAs as part of the state's complex and evolving regulatory regime, the exercise of federal review in this case "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." Although, as Delmarva points out, this case involves important issues of federal law, "abstention requires a balance between 'having federal rights adjudicated in federal court' with 'state interests in the control of state regulatory programs.'" Martin v. Stewart, 438 F. Supp. 2d 603, 607 (D.S.C. 2006) (quoting Johnson, 199 F.3d at 723). Here, that balance tips decidedly in favor of abstention.[15]

## CONCLUSION

For the foregoing reasons, the Court concludes that, under the Rooker-Feldman doctrine, it lacks subject matter jurisdiction and that the action accordingly should be dismissed without prejudice. Alternatively, even if there is jurisdiction, it is appropriate, for the reasons set forth above, to abstain from the exercise of jurisdiction to allow the Supreme Court of Virginia the opportunity to determine the issues upon which the Complaint is based. Under

---

[15] The SCC argues that abstention is also appropriate under RR Commn. of Texas v. Pullman Co., 312 U.S. 496 (1941). As explained above, decisions of the Supreme Court of Virginia might make it unnecessary to decide Count II which raises a constitutional issue. Count I is not covered by Pullman.

29

the circumstances presented here, it is appropriate to dismiss the action rather than to stay it, notwithstanding that conceptually Count II is subject to Pullman abstention.  Accordingly, the action will be dismissed without prejudice.

It is so ORDERED.


_____/s/_____ *REP*

Robert E. Payne
Senior United States District Judge


Richmond, Virginia
Date: July 23, 2007